The United States Court of Appeals for the Federal Circuit is now open and in session. God save the United States and this honorable court. Okay, our first case this morning is number 19-1506, Free Stream Media Corporation v. Alphonso Inc. Before we begin, I'd just like to alert counsel that the panel has some concern about the amount of material that's marked as confidential. And we are going to be asking questions about the relationship with Vizio. My understanding is that what's marked as confidential are the various fields that are processed. And I don't think our questioning will get into that area. But if we ask a question that intrudes into confidential material, we expect counsel to advise us of that. And then we'll figure out how to proceed at that point. Do counsel have any questions about that? And do my colleagues have any questions? Hearing none, why don't you begin, Mr. Powers. Thank you, Your Honor. May it please the court. I'd like to begin with the Akamai issues raised by the Vizio contract that Your Honor just alluded to. The district court committed three errors in granting summary judgment under the Akamai analysis, two of them legal, one of them factual. The two legal errors were first in treating claims 10, 13, and 18 similarly to claim 1. Claim 1 certainly does have a television generating fingerprint data, and therefore the Akamai issue is live there. However, claims 10, 13, and 18 are not structured the same way. And the only presence of a television is that it is part of the environment in which the Alfonso server operates and is merely communicatively coupled to that server. There is no issue. Mr. Powers, can I just interrupt you since you mentioned that? This is Judge Hughes. What does communicatively coupled mean in your view? It means that you can access data from it directly or indirectly, and there were claim constructions below about that question. And there's no debate, I think, among the parties that the information What does indirectly access data mean? So, for example, the Vizio television data would be uploaded to the cloud and Alfonso would access it from the cloud. There's just an intermediary server which is accessing the information and holding it. Do you agree that Alfonso doesn't access data directly from Vizio TVs that were relying on your indirect prong here? Yes, that's correct. So your definition of indirect seems pretty broad. Would that encompass Vizio? And I know this is old school. Nobody would do it like this anymore. But if Vizio put a bunch of data on a huge hard drive and sent it to Alfonso, and then Alfonso hooked that up to that system, would that be indirectly accessing data from Vizio TVs? Would they be communicatively coupled with those TVs merely by downloading data to a hard drive, sending it through the mail, and then hooking it up to the Alfonso system? I think that's a harder question than what the facts present here, because the construction is, quote, connected in a manner that permits communication. And certainly there are cases in this court and many others which make clear that such communication need not be a direct wire connecting one device to another, that there are often intermediary devices, and that is considered to be connected. But it still has to be communication, right? It doesn't just have to be a one-way download of data. Communicatively coupled doesn't necessarily require a talking back and forth. It just means that Alfonso can access the data from the TV via some communication, and it does so via communication with the servers in the cloud that are merely intermediary. It seems to me that the hard drive hypothetical is the same thing. It's accessing the data through the hard drive via the mail. There seems to me little difference in uploading data to the cloud on Vizio's own servers and putting it on a hard drive and sending it through the mail. The only reason I said I think it's a little harder, Your Honor, is that the form of indirect communication that I'm referring to is quite common and is commonly understood to be a form of communication. You're communicating through an intermediary device where it's all done in the cloud, and that is well understood to be. Okay. Can I just ask one more question on this point, and then I'll let you move on? How are you communicating with the TV? Aren't you just communicating with the part in the cloud where Vizio uploaded this data and that there's no active either direct or indirect coupling with the TVs themselves? There is no direct coupling with the TV. The TV couples to the cloud and the Alfonso server couples to the cloud, and in that sense, that was communicatively coupled. I also don't believe that was the ground for ruling below. It was argued below, though, right? It was argued below tangentially, but that's certainly not the basis for the ruling below as to claims 10, 13, and 18. What about the specification, which talks about an intermediary server as being part of this communicatively coupled thing? That further supports the idea that that form of communication coupled is satisfied by the claims. Counselor, this is Judge Reina. I have a related question, and this goes to the communicatively coupled issue that my colleagues have brought up. Under claim 10, the coupling is between a television and a mobile device through a network, correct? Under claim 10, the server is communicatively coupled with a television and a mobile device. It's not coupling the television and the mobile device directly. You also argue that the district court erred because claims 10 do not require the use of a mobile device. True. That's a subterranean video issue. Okay. Is it your position that the mobile device itself, it's not claimed, it's not part of this patent? Anything dealing with a mobile device, including its use, that's not part of the patent, correct? That's not quite our position, Your Honor. It's certainly in the claim, but it's different in the sense that it's not part of the system that is being claimed. It's in the preamble, of course, but it is not something that would be required to be controlled under Akamai or used under Centillion. So that would be like the cross-medical case where you had a part of bone that was connected and they didn't require control over that under Akamai, for example. So there is a difference between claim 1 and claim 10 in both the TV and the phone, for sure. Okay. So then in claim 1, it talks to the relevancy matching server through a sandbox application that's connected to the telephone. And I'm intrigued by this whole notion of the sandbox application. That's related to the phone only, is that correct? That's part of the phone's operating system, how it protects the phone from being disrupted or hacked or other things. Yes, that's part of the phone. Are you claiming that? No, we're claiming that's the problem. What we're claiming is that we have found a way to pierce that sandbox application so that you can place a targeted ad on the phone. Are you claiming the way that you found to pierce that problem? Yes, that's through the embedded object that the relevancy matching server creates as part of the whole process of claim 1. Okay. Could we turn to claim 1, which does seem to be different from 10, 13, and 18, in that it requires a television? Yes, we don't dispute that. I'm not understanding how merely purchasing data from Visio can amount to using the television as part of the system. Understood, Your Honor. There's two errors on that issue. First, a legal error about what is required under Occomy for direction and control, and a second, a factual error based on the facts of the contract between Alfonso and Visio by which Alfonso directed Visio to do certain things. The legal error committed by the district court was to require specifically that the contract say, you must give us these results according to the method steps of the claim. That's the how that the district court required in Appendix 10 and 17. That, of course, is inconsistent with the general principle that you can't escape liability merely by contracting it out. But it's also very inconsistent with this court's decision in Mancus v. Vivid Seats, 822F3rd, 1302 and 1310, where the district court ruled exactly the same way the court did here, finding that the contract didn't specify the particular claim steps, and held that Occomy makes clear it does not suffice to conclude that the local viewers are not required to take the claim steps they perform. There's no dispute that the Visio TVs do perform the claim steps. The only issue for the ruling below was that the court felt that there wasn't sufficiently clear evidence that Visio was required by Alfonso to perform specifically those steps. The Mancus case says that's not the right test. And even if it were, the factual dispute is created by the actual contract that Alfonso has with Visio. That contract at Appendix 2230 and 31, and then Appendix 2, Attachment 2 at 2237, has two things that make clear there's a specific factual dispute about whether Alfonso's contract with Visio required it to generate fingerprint data, which is all that's required in the claim. The first is that the contract requires at 2230 that the audiovisual content on the TV be identified quote, without the aid of metadata, without the aid of metadata. That is what generating fingerprint data is. That's precisely the definition of it. And that was proven by us at Appendix 3056, 1864, 65, and 2237. That is the essence of what fingerprint data is, is doing it without metadata, i.e., you're recognizing the content itself by the content. But second, Attachment 2 specifies both the manner and frequency by which Alfonso insisted that Visio generate his data. That is where I think your Honor's concern about confidentiality arises. I'll just note that at a high level, the content recognition fields there are exactly what fingerprint data are, and there's no dispute that that's what Visio did. They did generate fingerprint data, again, and that is all that's required by the claims. The question of the level of direction and control is a question of fact. Those are specific facts from which a jury easily could have confirmed that that direction and control was present based on the contractual requirements, and that should have gone to the jury for factual resolution. Mr. Powers, this is Judge Hughes again. I know you're now into your rebuttal, but I just wanted to touch briefly on the Sling portion of this case because even if we disagree with your views about the Visio TVs and conclude that they're not communicatively coupled or under Claim 1, they're not sufficient to provide the TV, that ground doesn't apply to Sling, right? True. Okay. So what was the basis for the District Court's summary judgment on Sling? Was it the no telephone, no mobile device, and no computer relevancy matching? Not as to that. Sling is just the source of the data, so you're right about the mobile phone ground would apply. That's the centillion issue that I was hoping to get to. But what about the relevancy matching? Does that apply to all three? That's the data and how Alfonso uses it, and this is very complicated and a little confusing about some of the grounds the District Court relied on or not, but my understanding is that Alfonso's view is in both the Visio and the Sling factors, its computer doesn't do relevancy matching because it's its actual human employees that take the data and match the segments with the IP addresses and that that's not done by a computer, which is what I think your claims require the computer to do that matching, relevancy matching, right? You're exactly right about what their argument is, about what the ruling below was with regard to the human interactivity with the relevancy matching, and I realize I'm in my rebuttal time. I would very much like to address both the centillion issue briefly and this human interaction issue on the relevancy matching server as well. Okay, well, I'd like to do that, but I'm confused about this discussion because I looked at footnote one in the red brief on page three, and it says that Sling isn't an issue on appeal. Do you have a different view of that? So Sling is not an issue on appeal as far as the Visio data acquisition argument goes. Alfonso did make an argument that even as to where the data came from the Sling application, that in the Biswax server that they still have their human activity argument. So the way to think of it is that Sling does not apply to the Akamai analysis, but their argument that they've maintained as to human activity would still apply to Sling. And you're still saying that the summary judgment as to non-infringement on the Sling was incorrect, aren't you? Absolutely. So after that one, the judge stopped me. Sorry, go ahead. Yes, because we believe the district court got the other two grounds wrong, i.e., it is the Biswax server, which is the relevancy matching server, which does the matching at 50,000 times per second. Obviously no human being is doing that. And as to the Centillion argument, that relevancy matching server is exactly what Alfonso was putting into service and benefiting from, which is what Centillion requires. Okay. So why don't you go on and address the other two points, the Centillion argument, and I forget what the other one was. Thank you, Your Honor. With regard to Centillion, there's, again, a distinction between Claims 1 and Claims 10, 13, and 18, because... Centillion has nothing to do with 10, 13, and 18, right? It should not, but it was relied upon by the district court to do so. But Centillion does not apply to 10, 13, or 18, but does legitimately apply to Claim 1. And so that is one error by the district court with regard to its Centillion analysis. The primary issue, obviously, on Centillion is who is putting the system into place and benefiting from it. And the mistake that the district court made was in believing that the phone, which obviously Alfonso does not have the phone and use the phone to request the ad, but was in focusing the lens of the Centillion analysis on that end. If you look at the claim, the phone is a minor part of it, and the rest, the whole claim is about what Alfonso does put into service, what it does control, and certainly what it benefits from, which is a primary issue under Centillion. And so the phone merely requesting the information and putting into motion the entire Alfonso apparatus is similar to the shopping website cases where, yes, a third-party human computer has to log into that website, but the whole website is being done for the benefit of the owner of the website. Just as here, Alfonso's relevancy-matching server is all put into effect and benefited from by it. So that was the mistake it made on Centillion. Okay, what about this issue about the human designation of the data that's the subject of interest? Yes, thank you, Your Honor. That's not covered by the claim. Yes, Your Honor. So on this one, it is certainly true, as it is true in all computers, that humans program the computer. They load the data that the computer is going to use. And in this context, they would load the ads that are going to be served. They would load, for example, the thousands of IP addresses that watch the particular show. But that's not the question for the court. The question for the court is who is doing the matching at 50,000 times per second when all those ad requests come in and you have to decide who gets the ad and who doesn't. The thing that is doing that matching, i.e., taking the IP addresses and linking them up to the ads to be served at 50,000 times per second, that is the BSWAC server computer, not a human being. Sorry, this is Judge H. Let me interrupt because this is where I'm very unclear about the parties' positions and whether there's a factual dispute. I thought that the BSWAC system already had uploaded the matched IP addresses and the segments or the targeted ads. Before it gets uploaded to BSWACs, you have a list of IP addresses that are already matched to certain either ads or segments. I'm unclear on this, but let's say that it's the ads, and then all that has to happen is BSWACs is a certain IP address asks for an ad and it goes into that computer and matches the IP address, but the ad is already matched. Am I mistaken about how BSWACs occurs? If I'm not, why does that satisfy the matching limitation if the matching is done previously by Alpine employees actually uploading lists of IP addresses and identifying them with certain segments? Thank you, Your Honor. You are absolutely correct that BSWACs has uploaded to it prior to being pinged by a phone a list of IP addresses. Let's take an example. Let's say that the campaign is that Chevy wants to serve a Chevy ad to everybody who watched a Ford ad. Let's take that as the example. So BSWACs will have loaded up to it thousands and thousands of IP addresses of people who watched Ford ads, and BSWACs will have uploaded to it the Chevy ad that Chevy wants to serve to those IP addresses, but the matching hasn't occurred yet. The matching occurs when one of those IP addresses that happen to have been on the list of ones that watched the Ford ad pings the server. That server then looks to see if that IP address matches anything in its database. If so, yes. Then it bids on the ad. If it wins the bid on the ad, then it matches the ad to that IP address and sends the ad to that IP address. So that is where the matching occurs. But the matching between the IP address and the Ford viewing is already done when it's uploaded to BSWACs. The data is already matched. Here are the IP addresses that have watched Ford. That is true. That is absolutely true. And it's also already uploaded. So all that BSWACs is matching really is an IP address. And that is the primary data which is required to be matched in the claim. It's matching the primary data, which is the IP address, which comes in, and that's the whole structure of the claim. That's how it works is that you're matching, you're trying to deliver it to that IP address, the right ad. So you're saying the matching doesn't have to be between the IP address and the viewing under your claim. It just has to be to the IP address if that has already been pre-associated. And let's just assume that was done through human means, by computer means. You know, make the hypothetical even clearer. There was no computer involved in the matching. Visio got a list of here are 10,000 IP addresses that watched a Ford commercial, and they entered it into the database one by one. I mean, clearly that's not going to happen, but let's just assume. And then they've done, the human has done the matching between the IP address and the Ford viewing, and so all D2X does is match an IP address. You say that satisfies the claim for relevancy matching? I thought relevancy matching required that connection between IP address and viewing, not just matching an IP address. So you are raising a slightly different question. You're right that there are two questions. One is what is the matching? Excuse me. But the second is what does it mean to use a relevancy matching factor, a relevancy factor? The claim does not require that the relevancy factor be created by a computer. And Your Honor is right. That's the matching between the idea of matching the Chevy with a Ford viewing, right? Yes, the relevancy factor could be that I want to show a Chevy ad to Ford views. And the beeswax clearly uses that as part of the campaign ID, so there's no question that the relevancy factor is used. And this was a mistake the district court made in saying that relevancy factor had to have been made on the fly by the computer. The claim doesn't say that. The claim merely says that the computer uses the relevancy factor. Which it undeniably does because there's a campaign ID that says show Chevy commercials to the group of people who watch Ford. That's relevancy. But the matching is between the primary data, which is the IP address, and the ad. And that's exactly what the beeswax computer does. Because that has to happen very fast in real time. Because an individual IP address comes in, the fact that it was on a list of thousands doesn't mean that that was matched. That's just a list of the database. The match occurs when one of those IP addresses comes in on 150th of a second and is matched with the ad and gets the ad quickly. That's the matching step. So the relevancy factor and the matching are two different things. The matching has to occur by the computer. No question it does. The relevancy factor has to be used by the computer but not created by it. All right. Well, unless my colleagues have further questions, I think we're about out of time. Mr. Powers, we'll restore your four minutes for rebuttal, and we'll hear from Mr. Chatterjee. Thank you, Your Honor. Your Honor, this is Mr. Chatterjee. May I proceed? Yes. Thank you, Your Honor. May it please the Court, this is Neil Chatterjee, and I represent Alfonzo in this case. If I may, I'd like to start with, I believe, I don't have all the voices down, but I believe it was Judge Hughes' questions, followed by several of the other judges, about the construction of the term communicatively coupled. The definition of communicatively coupled is in the appendix on page 34, and the agreed-upon construction is connected in a way that permits communication. If you look at the relevant claims here that talk about that particular term, what the construction applies to is that there's a communicative coupling between a television and a mobile device. And I think, Your Honors, hit the nail on the head when you asked the question of, if I were just to give a hard drive that had a bunch of data from Vizio that was mailed to somebody else, would that satisfy the communicative coupling? And the answer is that it doesn't. And here, it's no different. All they've done, that Vizio's done, is they've downloaded a bunch of information onto an online storage repository, which is a virtual hard drive, and then our client, Alfonso, pays them to download whatever data is available. Okay, but the problem with that, it seems to me, is that if you read the specification, the specification itself appears to contemplate that the use of that intermediary server is within the claims. That's correct, Your Honor, although there's one material difference between what is in Figure 7 of the patent and our case. Because in the Alfonso case, there is a human being that interrupts that communication between the intermediate server and the smartphone or the mobile device. So there is no connection that works from that intermediate server that goes directly to a smartphone. There is no connection. How does the human intervene? What the human does is the information is downloaded to the Alfonso environment. An Alfonso person, and this is outlined in the Coda J declaration that's in the appendix, and then that human being fills out a series of forms. One is called the campaign segment tool. They then upload it to a different environment, which is Beeswax, and they basically offer up the ability to place an ad. Beeswax is essentially an eBay for advertising. They take a number of bids from a number of different people, and whoever is willing to pay the highest amount, Beeswax decides whether or not the ad is delivered to the mobile device. But the interruption is in the middle because there is a human being that downloads the data, that puts it into a form, and then that form is then uploaded to this other environment called the DSP, and this specific DSP is called Beeswax in order to compete for that. Is the human being doing anything more than identifying what the campaign is? In other words, that we're trying to match Ford viewers with Chevy ads? Yes, Your Honor. What the company does, and again, this is outlined in the Coda J, they fill out a form. So they might say, I want to see everybody who has looked at a Chevy ad, and we'll download that data. We'll fill out a form based upon the criteria that it identifies based upon their human activity, and there can be many different criteria, and then when that form is filled out, they then have customers that will want to place ads that might meet those forms. But all of the relevancy matching, to the extent there is any, is being done by a human being at Alfonso. But I'm not sure that I understand that answer. What is it that the human is doing other than determining what the campaign is? That is what the human being is doing, and then the second thing that the human being is doing is they're physically entering the data to place a bid for advertising on the Beeswax system. Physically entering the data, what does that mean? So they will say, for example, I want to place an ad for Ford, and this is what Ford is willing to pay for that ad. And they say that to Beeswax, the Beeswax system. And the Beeswax system will then have essentially an auction of many different companies that are all competing to deliver an ad to a mobile phone, and Beeswax will decide which ad is the winner based upon who is paying the most. This is Jed Hughes. Can I ask a question? Let me preface by saying it seems like there's two forms of matching here. There's a matching between viewership and an IP address, and then there's a matching between a specific ad campaign and people that fall into the category of viewership that they want. Is that correct? There's two different forms of matching. That's right. Yes, Your Honor, they're done by two different systems. Well, and what is relevancy matching? Is it associating an IP address with particular TV viewing, or is it associating the IP address that falls in that category with a targeted ad campaign? I understand your position. Sorry, let me just play this out so you're clear what I'm getting at. I understand you to be saying that the Alfonso employees do the first matching, i.e., they query the database to see who watched the Ford ad, and so that matching is done by an Alfonso employee. Is that correct? That is correct, Your Honor. Now, who does the matching between once you have, here are the 10,000 IP addresses associated with people who watched Ford ads in the last month. Who then does the matching between those IP addresses and the Chevy ad when Chevy says, I want to send that Chevy ad to all those people? That is also a human being at Alfonso when they're uploading to the Beeswax system, Your Honor. So the Beeswax, when all the information is uploaded to Beeswax, the matching is already done with the particular ads? That's correct, Your Honor. So Beeswax knows these 10,000 people watched Ford, and Chevy wants to send them an ad if they meet the right price. So all the matching is done beforehand, and all the matching that Beeswax does is matching just an IP address. That's correct, Your Honor. It's actually even simpler than that. Essentially, what the Alfonso user does is they fill out this campaign segment tool that says, here's everyone that watched a Chevy ad, and they upload that data to the Beeswax system. When the Alfonso person puts in an ad request, they fill out a separate form, and it says for all of the Ford ads, go pull the IP addresses from that other record. That's all it does is it has a pointer to that other record and says, go pull those IP addresses if we're the winning bid. All the matching, though, is done. The only thing that is in the advertisement request that a user or a human being at Alfonso fills out is a pointer to this other record. There is no relevant matching. And does this ground for non-infringement apply to all of the claims at issue here? Yes, Your Honor. Okay. Your Honor, just to kind of address a couple of the points that we discussed, that is where this case should start and end, in our view, is the human matching that occurs. There was not really a dispute at all about the facts here, and it was all outlined in detail in the Cota J Declaration, which can be the Chordia Declaration, which can be found at pages 1510 to 1513 of the appendix. I do want to touch upon a couple other issues. The Centillion and Akamai cases really don't have any application here. We disagree with Mr. Powers on that. Even to Claim 1? Even to Claim 1, Your Honor. And the reason it doesn't apply to Claim 1 is because what is claimed in the claim itself is two things. One of the things it requires is that there is a television to generate fingerprint data, just as an example. And in Claim 1, all we do is we buy data from Visio, and the contracts are very clear that Visio decides whatever they want to collect from wherever they want to collect it. And the only thing that we do is we specify the format in which data is delivered to us. And that is entirely independent. We do not control the TVs. We don't direct how they collect the data. We don't direct who they collect it from. We don't set a time for when they have to collect it. We just buy the data in bulk, and we ask them to format it in a particular way. Okay. But Mr. Powers is saying that the fact that you don't control the detail is irrelevant. If you have a contract with them, and pursuant to the contract, they do it in a way that would be within the claims that that's sufficient, even if the contract doesn't require them to do it in that way. Yes, I understand that's Mr. Powers' argument, Your Honor. I don't read Akamai as going that far, because if that were the case, any commercial transaction with anybody where you're simply buying something in a grocery store that you would then be infringing for all of the manufacturing process that went into creating a product, that could not be the reading of Akamai. Okay. But he suggests, and I'm not familiar with his case, and I may have the name wrong, Manhouse case or something like that. Minkus. Adopts his position. We don't agree that Minkus adopts that broad a position, Your Honor. If you go back and you look at the Akamai case, what Akamai says is we conclude on the facts of this case that liability under Section 271A can be found when an alleged infringer conditions participation in an activity or receipt of a benefit upon performance of a step or steps of a patented method and establishes the manner or timing of that performance. Neither Minkus nor Akamai says. Is Minkus opposed to Akamai? It is. It's interpreting Akamai, Your Honor. And Your Honor, I'm out of time. May I continue? Don't worry about it. I'll tell you to stop when we're ready to have you stop. Yeah, thank you, Your Honor. The point I make here is what both Minkus and Akamai stand for, is if Alfonso were to say we want you to collect data from televisions in northern California between the hours of 4 p.m. and 9 p.m. and we want you to deliver that data to us, we would have a much closer case as to whether that would satisfy the Akamai standard or not. But that isn't what happens here. And the agreement specifically disclaims any responsibility or any obligation by VIZIO to collect data from a TV in any particular manner. Counsel, who controls the hours in which Alfonso gathers the data? I'm sorry, I couldn't hear you, Your Honor. I understand that Alfonso downloads the VIZIO data from the cloud, correct? Correct. And who controls that site, the cloud? Who has access to that? Yes, Your Honor. What I understand happens is that VIZIO controls the platform where the data is stored, and then Alfonso has the ability to connect into that platform through an API and downloads the information, and VIZIO preformats it so it's in a language that Alfonso can understand. Then nobody else can access that other than Alfonso, correct? We don't know, Your Honor. We don't know who else VIZIO makes that data available to or if they format it in similar ways for other people, because that's entirely within VIZIO's control. Who informs VIZIO how to format the cloud so that it's accessible by Alfonso? That is VIZIO dependent, Your Honor. We just get the information from them, and they tell us how to access it and download it. Okay, unless my colleagues have further questions about infringement, why don't we turn to 101? Yes, Your Honor. I'll just make sure that there are no other questions about infringement. Okay, hearing none, you can proceed with 101. Thank you, Your Honor. I'll be brief, given that I've already exceeded my time, and I appreciate the Court's indulgence on this. I'd like to start by just referencing a relatively new case that came out of the Federal Circuit. It's an unpublished case called Ex Parte Morsa, and that's 809 Federal Appendix 913. And there's a line of cases in the Federal Circuit, and we talk about this in our brief. It's the Intellectual Ventures case, the Bridge and Post case, and now Ex Parte Morsa that essentially say that these targeted advertising types of claims are patent ineligible under Section 101. And the Morsa case is particularly important here, because if you read that claim, it actually operates in almost precisely the way that free stream media Samba is trying to assert their patents here. It starts with understanding data associated with user behavior. It then does relevancy matching to provide a targeted ad, and it even includes a bidding system where the winning bid is ultimately placed. And this Court found in the Ex Parte Morsa that it failed to satisfy Section 101 of the Patent Act. Did you tell Mr. Fowers that you were going to raise Morsa? I did not, Your Honor. I was preparing yesterday, and I just did a quick search, and I found it. Okay, that's contrary to our rules. Our rules require the notification of opposing counsel. My apologies, Your Honor. Go ahead. The real issue that they talk about in their briefing is they say that there is a technical solution on the 356 patent, because there is a sandbox and a mobile device that could preclude the But the claims don't say anything about this. They don't say anything about how or why the sandbox exists. They don't talk anything about security. And their core arguments as to what the technical innovation here that takes it from an abstract claim to an actual inventive claim simply isn't reflected anywhere in the claim. Is it your position then that Samba looks at this sandbox technology as the claimed advanced? I'm sorry, Your Honor. There was a click on the phone. I didn't hear the question. Okay. Is it your position that Samba technology is a claimed advanced? No, I don't believe they do. They do claim that the sandbox technology is a claimed advanced, and that is not a core to their inventiveness here. Their claim is that they figured out a way to get around the sandbox technology. Is that correct? You're saying that's not part of the claim. That's right, Your Honor. That's exactly right. What about Step 2 of ALICE? In Step 2 of ALICE, the question is, is there something new here in order to claim or something that takes it from being an abstract concept to something that is inventive? Here again, if you look at the Bridge and Post case, which we compared in our brief as well as the Intellectual Ventures case, there is nothing here that really transforms this into some sort of inventive step. It doesn't improve the operation of computers. It doesn't really solve any kind of technical problem. It doesn't provide anything new that is inventive. You even heard Mr. Powers say, for example, that the relevancy factor can be a human being just deciding its relevance. If there's anything that one could consider inventive in this claim, it would be applying that relevancy factor for the relevancy matching. If it's merely a human being exercising judgment, that isn't taking this out of the realm of patent and eligibility. Okay. Do my colleagues have further questions about 101? Okay. Hearing none, let's hear from Mr. Powers, and then we'll restore Mr. Chatterjee's rebuttal time. Thank you, Your Honor. With regard to communicably coupled, I will refer the court to page 29 of our blue brief, which cites their expert as admitting that the specification and its application are typical to have such communication couplings indirect. I think that should eliminate that issue. With regard to the human activity question, I'd like to address Judge Hughes' question about there being two types of matching. Your Honor is right that there are two types of things that could be considered matching. One where you're setting up the data at the front end,  and the claims is what you were referring to, I think, as the second matching, which is when an individual IP address comes in. Not the creation of the list of thousands of them, but when one phone with an IP address comes in, matching that against the ad to be placed to that phone. Well, Mr. Powers, can we go to the claim language? I'm looking at claim one because it describes it more particularly, I think. It says match primary data generated from the fingerprint data. What is that? Primary data is the IP address, and targeted data is the ad. And I heard your friend on the other side say that is done prior to uploading to BSWACs. Is that a dispute of fact over that? There is a dispute of characterization, I think. There's not a dispute of fact. There is no question that an Alfonso employee loads all the IP addresses of people who saw a Ford ad and makes a request to BSWACs that a campaign to show a Chevy ad to anybody who saw the Ford ad list, that that be done. So BSWACs, a human being matches IP addresses, targeted IP addresses with a particular ad. A human being specifies what BSWACs is supposed to do when an IP address comes in. To do that, it has to say these 10,000 IP addresses watched the TV show we're keying on and, therefore, associate them with the Chevy ad. BSWACs has that information from Alfonso. That is true. So what BSWACs does is, well, why isn't that matching the primary data from the fingerprint data? And the primary data is the IP address? Yes. And the fingerprint data is the TV viewing? Yes. That's just loading up the information for which BSWACs can make the match. Right. Wait, wait, wait. I'm just trying to go through the claims step by step. So the primary data is the IP address. The fingerprint data is the TV viewing. The targeted data is the ad? Yes. Okay. And when does the IP address come in? I'm sorry, I don't see individual. It sounds to me that's what a relevancy matching server, your claim says this is what the relevancy server does. It matches the primary data with the fingerprint data with the targeted data. If that is done by an Alfonso employee instead of the computer, how do they infringe? They infringe because that's just loading up the data for the BSWAC server to do its job. So the campaign ID, which is created initially, just says, we want to show this ad to any one of these groups of people. So, for example, it might be people who watched foreign ads. It might be people who watched the Super Bowl. It might be 20 different types of factors. That's their decision. But the matching on the claim comes in when an individual IP address from a phone comes in and BSWAC has to figure out very quickly which ad to serve to that IP address. And it does that based on this bidding system and matching that IP address with whatever ad is supposed to go to that group of IP addresses based on the campaign ID. I'd like to address very quickly counsel's argument that there's nothing in the Alfonso-Vizio agreement that dictates the manner by which Vizio produces the data. The manner is dictated twice in the contract. One is that the audiovisual content has to be done without the aid of metadata. That's the quote. Without the aid of metadata is specifying the manner in which it be conducted. And that means using fingerprint data as per the experts of the discussion that I gave in the earlier context. The second place it does so is in attachment two, in appendix 2231 and 2237, which specifies various fields that have to be filled in, some of which are content recognition type fields, again, at a high level for confidentiality purposes. I'd like to address very briefly the 101 question, if I may. Go ahead. The argument that was just made to you is that targeted ad claims per se are unpatentable. And I would agree with that if that's what the claim is covering, is covering the concept of a targeted ad. That is not this claim. This claim is claiming a system that may be used to create targeted ads, but the concept of the claim is not do a targeted ad. The concept of the claim is in order to do this right, you have to pierce the sandboxing technology that the phones have. And this claim specifies a way to do that. How does it do that? How does it specify a way to do that? It has the embedded object that the phone is going to process that is placed there by the relevancy matching server. And the content identification server is also there to go through that sandbox application. So that way when you have you're sitting there with your phone watching your TV and a Ford ad comes up, all of a sudden you get a Chevy ad on your phone. That can't happen without. Let's take claim 10. Where is this dealing with allowing communication in a sandbox environment? What language in the claim is dealing with this? If you look at the matched primary data limitation, it says, quote, matched primary data generated using a fingerprint data with targeted data based on a relevancy factor comprising at least one of a category of the primary data, a behavioral history of the user, a category of sandboxed application, and another information associated with the user. So that's specifically saying you're using the sandbox information as a way of matching the IP address, for example, with the ad. And the last clause is wherein the relevancy matching server is to cause a rendering of the targeted data to the user through the sandbox application of the mobile device. So it's specifically saying that that relevancy matching server is piercing the sandbox. And the specification goes into more detail on ways that it can do that. But, for example, using a common IP address. So if your phone, if you're sitting in your home and you're watching your TV through an IP address and your phone is linked to that same IP address, this is exactly what the relevancy matching server is that's being discussed in 10 and the relevancy factor comprising including the IP address. You're saying that the details of how to do that are in the specification but not in the claim. An example of how to do that is in the specification. The claim says you're going to pierce the sandbox application using the relevancy factor and specifically says the relevancy factor includes the category of sandboxed application, the primary data, the behavioral history of the user. Those are examples of how you can pierce the sandbox application. I think it's more fair to say, Your Honor. Go ahead. It's your argument that under claim 10, the language that says to cause a rendering of the targeted data, that's your claim to advance. Is that correct? That's half of it. The other half is the part above which says the relevancy factor comprising. We're saying the relevancy factor has to comprise the category of primary data, behavioral history of the user, a category of sandboxed application. That is part of the way that the sandbox application is pierced. I don't understand that, Mr. Powers. I thought the relevancy factor was the relationship between Ford viewing and Chevy ads. That's an example for claim one, yes. How does that supply technological solution of piercing the sandbox? That was an example for claim one. This is claim 10 that is providing more information and different information about what the relevancy factor comprises. And it makes clear that part of that can be the sandboxed application. And I think the fair way to say Mr. Powers, when you keep saying category of a sandbox application, what does that actually mean? Isn't that just another type of identifier of a particular individual using a particular device? It's similar to – I don't understand what you're saying when you say a category of a sandbox application. That sounds like just one other possible relevancy factor along with IP addresses, behavioral history, all that kind of stuff, not that it's a particular way of dealing with the sandboxed application. I would half agree, Your Honor. So you're absolutely right that the category of sandbox application is listed here as part of the relevancy factor. The specification has more of an explanation of how that can be used, but that doesn't need to be in the claim. The point of the claim is that you're using the sandbox information to sandbox, as it says later in the claim. But what does that even mean? That's what I'm asking, and I'm not trying to be obtuse here. I don't understand what category of sandbox application means. Give me an example of what is the type of category of a sandbox application and how it's used. Android, iPhone, it could be something that specifies that this is an iPhone, which means that you would use that information to pierce an iPhone differently than you would an Android, for example. That's one example. How does the claim tell you how to do that? The claim doesn't need to, I think, Your Honor. The claim says, needs to say what you're doing. The explanation for how that can work is found in the specification. I don't think that's consistent with our cases. I believe it is, Your Honor, because there are many cases that require, of course, that the claim have the elements to provide the technological advance. The claim doesn't have to have the detailed explanation for how that advance functions. That I don't think your case is required at all. Counselor, this is just to drain a note. In your infringement argument, and I realize that now we're talking on Section 101, and this is directed to Section 101, but this is a question that I asked earlier in these arguments, and that is that you say in your brief that the district court errors because Claims 10, 13, and 18 do not require the use of a mobile device. That's your argument. Yes. If your claimed advance is that this patent, its relevancy matching server causes a rendering of the targeted data to the user and then it goes on through the sandbox application on a mobile device, doesn't your claimed advance require the use of a mobile device? Not in a centillion sense. I'm not talking about centillion. I'm talking about in the Section 101 sense. Yes. So in the Section 101 sense, what is required is that the server renders this information to the phone. That's what's required. But in a centillion sense, that's not use of the phone. No, it doesn't say that. It says that it renders its sandbox reachable service to the phone. Yes. So where in the relevancy matching, the language of, say, Claim 10, where in the relevancy matching server is to cause a rendering of the targeted data to the user through the sandbox application of the mobile device. So that's exactly what we're saying is the technological advance that was not possible before, and it's done that through the relevancy factors that are shown up above and two clauses above. Right. So absent that language, absent this particular part of Claim Number 10, to cause a rendering of the targeted data. If that was not in the claim, then this would just be a mere targeted advertising. I disagree with that, Your Honor. I think that it would be. I mean, the only thing that makes you different here is this to cause a rendering of the targeted data to the user through the sandbox application of the mobile device. That's the technological. Go ahead, sir. That's your advance. I certainly agree that's part of it. But I would also draw a hard distinction between a claim which is claiming the idea of relevant ads versus a claim that is claiming a system, which is. You're claiming a system that gets you past the sandbox applications of the mobile devices. That is true. Okay. As the claim specifies. And using the techniques that the claim identifies to limitations above. Okay. Unless my colleagues have further questions, let's hear from Mr. Chatterjee. Thank you, Your Honor. On 101. Thank you, Your Honor. This is Neal Chatterjee for Alphonso again. Your Honor, I think Your Honor has hit the nail on the head in terms of the issues with these claims and their vulnerabilities under Section 101. As we've been going for quite some time, I'll just focus on one issue, which was a question that one of Your Honors asked about the phrase that's used here in Claim 10 that talks about rendering of the targeted data to the user through the sandboxed application of the mobile device. And I heard one of the judges mention that Mr. Power's response was not consistent with the case law. And I agree with that because that claim is written purely in functional terms in an abstract way. It doesn't actually say how it's done in the claim. And that is the precise problem with the claim that makes it vulnerable and ineligible under Section 101 of the Patent Act. Mr. Power has made a lot of references to these embedded objects that are sent with a transmission. But you don't see that anywhere in the claim. He's relying on specification. And had they claimed that, we might have a different issue here. But that isn't what they claimed. They claimed purely a functional aspect of provisioning targeted advertising. And I believe one of the other judges also made a remark on how does this gel with the infringement allegation. As I'm focusing on rebuttal here, I think that that is an important point because they either have to say that this sandbox component is part of the claim and is relevant or it's not. And if it is relevant, it's patent ineligible because it's purely functional claiming stated in an abstract way. Unless your honors have further questions, I'll submit at this point. And I appreciate your time. Okay. Hearing no further questions, the case is submitted. We thank both counsel.